U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

**AUG 2 7 2010**

TONY R. MOORE, CLERK
BY_____
DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

YOUNG'S GENERAL CONTRACTING, INC.                 CIVIL ACTION NO.: 07-0613

VERSUS                                            JUDGE DOHERTY

GOVERNMENT OF ST. MARY PARISH                     MAGISTRATE JUDGE HANNA

**MEMORANDUM RULING**

Before the Court is the Motion for Summary Judgment [Doc. 71] filed by plaintiff Young's

General Contracting, Inc. ("Young's"). Plaintiff seeks summary judgment on the issue of whether

the contract between the parties is ambiguous, specifically, the provisions of the contract that address

unit measurement and payment procedures. Defendant, the Government of St. Mary Parish ("St.

Mary Parish"), has filed an opposition brief [Doc. 76], arguing the contract is not ambiguous.

For the reasons stated herein, this Court concludes the contract is not ambiguous. Therefore,

plaintiff's motion for summary judgment is DENIED.

I.      **Factual and Procedural Background**

        1.      **The Undisputed Facts**

        The instant lawsuit arises out of a dispute between Young's and St. Mary Parish related to

work performed by Young's, a contractor, on the St. Mary Parish Project Number 05-04-02 Cell 4-

Phase I-Stage 2A, Harold J. "Babe" Landry, Solid Waste Disposal Facilities in St. Mary Parish,

Louisiana. St. Mary Parish is a municipality organized under the laws of the State of Louisiana. The

contract between Young's and St. Mary Parish for the work to be performed at the landfill in

question was entered into by the parties on November 10, 2005. Generally, the scope of the project

involved spreading a sand drainage layer over a pre-existing synthetic liner.  After spreading the sand, the contractor was to install a non-woven geotextile fabric over the sand, after which a layer of operational cover, in this case clay, was to be spread over the fabric.

The following facts are undisputed, having been stipulated to by the parties in two pre-trial orders submitted to the Court:

- Young's began work under the contract in November 2005.

- The project reached substantial completion on August 7, 2006.

- St. Mary Parish kept daily totals of the cubic yards of sand it purchased and delivered to the Project through trip tickets and invoices it maintained.

- St. Mary Parish kept daily totals of the cubic yards of clay which it supplied to the Project through trip tickets and invoices it maintained.

- According to the invoices and trip tickets maintained by St. Mary Parish, the cubic yards of sand purchased and brought onto the Project by St. Mary parish was 97,579 cubic yards, which included the 25,000 cubic yards of sand purchased by Young's.

- Young's processed and spread in the cell the 97,579 cubic yards of sand purchased and brought onto the project by St. Mary Parish.

- According to the trip tickets maintained by St. Mary Parish, the cubic yards of clay brought onto the project by St. Mary Parish was 118,184 cubic yards.

- With regard to the 118,184 cubic yards of clay, Young's processed and spread in the cell, 111,198 cubic yards of clay.

- The remaining 6,986 cubic yards of clay was used in building roads and levees for the purpose of constructing the cell as directed by St. Mary Parish.

- Young's purchased and installed 1,552,500 square feet of non-woven geotextile liner.

- Young's was only compensated for processing a total of 52,137 cubic yards of sand at $ 6.90 per cubic yard.

- Young's was only compensated for processing a total of 52,694 cubic yards of clay at $ 6.90 per cubic yard.

- Young's was only compensated for installing 1,407,700 of non-woven geotextile liner at $.24 per square foot.

The parties agree, the contract between the parties consists of a Document entitled "Form of Agreement Between Owner and Contractor,"[1] as well as a one-page Change Order, dated October 26, 2005.[2]  The parties refer to the following portions of the contract in their briefs:

**Section 9.07   Determinations for Unit Price Work**

A. Engineer will determine the actual quantities and classifications of Unit Price Work performed by Contractor.  Engineer will review with Contractor the Engineer's preliminary determinations on such matters before rendering a written decision thereon (by recommendation of an Application for Payment or otherwise).  Engineer's written decision thereon will be final and binding (except as modified by Engineer to reflect changed factual conditions or more accurate data) upon Owner and Contractor, subject to the provisions of Paragraph 10.05.

*****************

**Section 11.03  Unit Price Work**

A. Where the Contract Documents provide that all or part of the Work is to be Unit Price Work, initially the Contract Price will be deemed to include for all Unit Price Work an amount equal to the sum of the unit price for each separately identified item of Unit Price Work times the estimated quantity of each item as indicated in the Agreement.

B. The estimated quantities of items of Unit Price Work are not guaranteed and are solely for the purpose of comparison of Bids and determining an initial Contract Price.  Determinations of the actual quantities and classifications of Unit Price Work performed by Contractor will be made by Engineer subject to the

---

[1] *See* SMP-22 – SMP-200.

[2] *See* SMP-201.

Although it is unclear to this Court whether the plaintiff has attached the entirety of the contract to its motion, it is clear the defendant has attached the entirety of the contract to its response.  Additionally, the defendant has Bates-stamped all of the documents it attaches to its response.  Therefore, for ease of reference, all references by this Court to the contract will refer to the Bates-stamped version supplied by defendants.  This Court presumes the "SMP" reference in defendant's Bates stamp numbers refers to "St. Mary Parish."

provisions of Paragraph 9.07.[3]

     C. Each unit price will be deemed to include an amount considered by Contractor to be adequate to cover Contractor's overhead and profit for each separately identified item.

     D. Owner or Contractor may make a Claim for an adjustment in the Contract Price in accordance with Paragraph 10.05 if:

     1. The quantity of any item of Unit Price Work performed by Contractor differs materially and significantly from the estimated quantity of such item indicated in the Agreement; and

     2. There is no corresponding adjustment with respect to any other item of Work; and

     3. Contractor believes that Contractor is entitled to an increase in Contract Price as a result of having incurred additional expense or Owner believes that Owner is entitled to a decrease in Contract price and the parties are unable to agree as to the amount of any such increase or decrease.

*******************

## SECTION 02350

### Select Fill: LCS Sand Drainage Layer; And
### Select Soil: Operational Cover and Structural Fill

1.3    MEASUREMENT

Leachate Collection System (LCS) Drainage Layer Sand and Select Soil Operational Cover: *Measured by the cubic yard of in-place material based on surveys conducted by Owner of pre-and post-installation conditions.* Leachate Transfer Line Ramp and Leachate Collection Sump Stormwater Diversion Berm Structural Fill: Measured by the cubic yard of in-place material based on CAD volume calculations conducted by the Owner.

*******************

---

[3] *See* SMP-65.

## SECTION 02373

## GEOTEXTILES

1.3.  METHOD OF MEASUREMENT

    1.3.1  8 oz. Non-woven Geotextile over the LCS Sand Layer: Measurement shall be made of the as-built surface area in square feet by geotextile.  Allowance swill be made for geotextile in anchor and/or drainage trenches but no allowance will be made for waster, overlaps, damaged materials, repairs, or materials used for the convenience of the Contractor.

1.4  BASIS OF PAYMENT

    1.4.1  8 oz. Non-woven Geotextile over the LCS Sand Layer: Geotextile installed and accepted will be paid for at the respective contract price in the bidding schedule.  This unit price shall include the cost of materials, equipment, labor, and other costs associated with placement of the geotextile.  Payment for work under this Section will be made under the item listed by the prefix in the Contractor's Bid Form (Section 00400).[4]

The Change Order of October 26, 2005, referenced by the parties and made part of the contract between them, indicates the following:

## ST. MARY PARISH GOVERNMENT

## PLAN CHANGE AND/OR SPECIAL AGREEMENT NO. 1

PROJECT St. Mary Parish Project No. 05-04-02; Cell 4 – Phase I – Stage 2A

    Item 02300 deleted.  The work under this item was performed by the Owner.

    Item 02350(a) changed to Item 02350(a)(1) and Item 02350(b) changed to Item 02350(b)(1).

    The Owner will furnish the material that was to be provided under Items 02350(a) and 02350(b) and the Contractor will spread and process Owner furnished material under Items 02350(a)(1) and 02350(b)(1).[5]

---

[4] *See* SMP-156.

[5] As Sections 02350(b) and 02350(b)(1) address the operational cover for the project (clay), the measurement of which does not appear to be in dispute in the instant motion, this Court does not address the effect of the Change Order to this section of the contract.

The Change Order then sets forth a table showing Item 02350(a) – "Leachate Collection System Sand" – with an original unit price of $17.88 per cubic yard, is changed to Item 02350(a)(a) – "Spreading and Processing Leachate Collection System Sand" – with a unit price of $6.90 per cubic yard. The effect of this change is that, under Section 02350(a), the estimated quantities of sand – 52,137 cubic yards – went from an estimated cost to St. Mary Parish of $932,209.56 to an estimated cost of $359,745.30 under Item 02350(a)(1), a substantial savings to St. Mary Parish.[6]

The crux of the dispute between the parties is the amount that Young's was paid under the contract. In its motion, Young's contends the contract and Project Manual (made a part of the Contract)[7] clearly provides Young's would be compensated for the actual quantity of material processed and installed by Young's, that is, the actual quantity of materials that was spread and processed by Young's as measured in cubic yards. Young's appears to focus its ambiguity argument on Section 02350 of the Project Manual, which addresses the measurement of sand, however Young's vaguely addresses Section 02373, which includes the measurement provision for geotextile liner, in its motion. Specifically, with respect to the geotextile liner, Young's argues the following:

---

[6] The Change Order of October 26, 2005 also changed which party to the contract would provide the fill material; under the prior agreement, Young's was to provide the fill material. The Change Order notes that the fill material would henceforth be provided by St. Mary Parish.

For ease of reference, a copy of the Change Order is attached to this Ruling as Exhibit "A." This Court notes the copy of the Change Order provided by the parties is signed by the Project Engineer, but is not signed by either a representative of Young's or a representative of St. Mary Parish. However, neither party argues the Change Order was not in effect and made part of the contract at issue. Therefore, this Court assumes, for purposes of this motion, the Change Order is part of the contract between the parties.

[7] All agree, the contract between the parties is actually a series of documents. The "core" of the contract is Document 00520, entitled "Form of Agreement Between Owner and Contractor." *See* SMP-22-27. Section 9.01 of this Form identifies the "Contract Documents." Included within those "Contact Documents" are the "Specifications and Appendix listed in the table of contents of the Project Manual." *See* Article 9, entitled "Contract Documents," Section 9.01(7), SMP-25. In this manner, certain portions of the Project Manual, including Section 02350, which addresses the manner by which materials [sand] processed in the landfill were to be measured, and Section 02373, which addresses the manner in which the geotextile liner was to be measured, are made part of the contract between the parties.

> With regard to the sand and clay, the technical specifications provided that these items would be "measured by the cubic yard of in place material based on surveys conducted by the owner of pre- and post-installation conditions. . . . *Further, with regard to the non-woven geotextile liner, this likewise was to be measured by the owner based upon surveys taken of the as-built surface area of the cell.*[8]

Considering the foregoing, it is unclear to the Court whether Young's is arguing that the measurement provision for the geotextile liner is also ambiguous, or whether Young's is merely alleging St. Mary Parish did not perform a required obligation under Section 02373, that is, the obligation to perform pre- and post-surveys, and thereby breached the contract.

Additionally, with respect to the Change Order of October 26, 2005, Young's argues the "Change Order states specifically, that Young's would be paid for each cubic yard of clay and sand fill material it 'spread or processed' giving no specific instruction how the material would be measured."[9]

In response, St. Mary Parish argues the contract clearly states Young's would be paid based on the amount of "in-place materials," a term of art understood within the construction industry to mean the following, as attested to by Anthony Hoppe, Jr., the project engineer, in his Affidavit:

> The term "in place material" denotes the volume of fill in the cell after installation. As such, this quantity is independent of the imported volume required to fill the cell and is based solely on the area of the cell and the depth of the fill after installation.[10]

St. Mary Parish further argues the area of the cell – its length times its width – together with the depth of the fill after installation is precisely the measurement contemplated by Dennis Young when entering the contract, as will be discussed later in the text of this Ruling.  St. Mary Parish also

---

[8] *See* Young's Motion for Summary Judgment, Doc. 71, at p. 6 (emphasis added).

[9] *See* plaintiff's motion for summary judgment, p. 3.

[10] *See* Hoppe Affidavit, attached as Exhibit 1 to defendant's opposition brief, SMP-17, at ¶6.

argues the Change Order of October 26, 2005 does not

> purport to change the method by which it would be determined how much [Young's]
> would be paid for work performed under the contract.   There is no mention of the
> Engineer's method of calculating the volume of "in-place material;" no declaration
> that the in-place material standard is being abandoned; indeed, there is no reference
> at all to any of the portions of the contract in which the method of calculating
> payments is described.[11]

Considering the foregoing, St. Mary Parish argues the reference to "in-place" materials in the

contract does not render the contract ambiguous.

In their pre-trial order, the parties listed as an issue of law whether the contract between

Young's and St. Mary Parish is ambiguous with respect to the provisions of the contract that address

unit measurement and payment procedures.   This Court invited the filing of the instant motion for

summary judgment prior to trial in an effort to streamline the issues for trial.  All briefing is before

the Court and the matter is now ripe for adjudication.

## II.     Law and Analysis

### 1.      Legal Standard – Motion for Summary Judgment

"A party against whom a claim, counterclaim, or cross-claim is asserted or declaratory

judgment is sought may, at any time, move with or without supporting affidavits for summary

judgment in the parties favor as to all or any part thereof."  Fed. R. Civ. Pro. 56(b).  Summary

judgement is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. Pro. 56(c).

> When a motion for summary judgment is made and supported as provided in this
> rule, an adverse party may not rest upon the mere allegations or denials of the adverse

---

[11] *See* defendant's opposition brief, Doc. 76, at pp. 10-11.

party's pleading, but the adverse party's response by affidavits or is otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. Pro. 56(e)

As summarized by the Fifth Circuit in <u>Lindsey v. Sears Roebuck and Co.</u>, 16 F.3d 616, 618

(5th Cir. 1994):

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986). However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. Id. at 322; <i>see also</i>, <u>Moody v. Jefferson Parish School Board</u>, 2 F.3d 604, 606 (5th Cir.1993); <u>Duplantis v. Shell Offshore, Inc.</u>, 948 F.2d 187, 190 (5th Cir.1991). Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

The Supreme Court has instructed:

> The plain language of Rule 56(c) <u>mandates</u> the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Where no such showing is made, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

> [. . . .]

> . . . In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint. As set forth above, Rule 56(e) provides that judgment "shall be entered" against the nonmoving party unless affidavits or other evidence "set forth specific facts showing

that there is a genuine issue for trial." The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. *Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.*

*Lujan v. National Wildlife Federation*, 497 U.S. 871, 884, 888-89 (1990)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)(emphasis added)).

The Fifth Circuit has further elaborated:

[The parties'] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence.  We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts.  We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. ...[S]ummary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*)(citations and internal quotations omitted).

Finally, in evaluating evidence to determine whether a factual dispute exists, "credibility determinations are not part of the summary judgment analysis." *Id.*  To the contrary, "in reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001).

**2.      Jurisdiction Under *Erie***

As jurisdiction in this matter is premised upon 28 U.S.C. § 1332 (diversity of citizenship),

Louisiana law governs the substantive issues of law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). As such, the Court must apply Louisiana law.

### 3.     Analysis of Motion

In the instant motion, Young's contends there are no genuine issues of material fact that the contract between the parties is ambiguous, "including, but not exclusively, the terms addressing unit measurement and payment procedures, and this ambiguity should be construed against St. Mary Parish Government as the party who drafted the documents."  As discussed herein, it is unclear to the Court whether, in arguing ambiguity, Young's is referring to ambiguity contained within Section 02350 (the measurement provision for sand), Section 02373 (the measurement provision for geotextile liner), or both.

Notwithstanding the foregoing, in its memorandum in support of its motion, Young's argues "the [c][ontract and Project Manual clearly provided that Young's would be compensated for the actual quantity of material processed and installed."[12]  The plaintiff then specifically focuses on the phrase "in place material" as used within Section 02350.  However, a careful reading of the instant motion shows Young's does not contend the term "in place material," as used within the contract to designate the measurement of sand, is ambiguous.  Thus, it is unclear to this Court whether the plaintiff is arguing there is, in fact, an ambiguity contained within the contract and where that actual ambiguity might be located (Section 02350, Section 02373, or both), or whether the plaintiff is merely arguing the contract requires that Young's was to have been paid a certain way – for each cubic yard of fill material delivered to the project – and it was not paid that way, *i.e.*, defendant breached the remuneration portion of the contract.

―――――――――――――――――

[12] *See* plaintiff's motion for summary judgment, Doc. 71, at p. 5.

Despite the foregoing imprecision in its motion, the plaintiff includes in its brief certain evidence and argument addressing the intent of the parties in confecting the contract and thereafter, including discussions between the parties during the bid process and prior to the execution of the contract; the manner in which Young's was initially compensated and the fact that St. Mary Parish subsequently changed the way in which it compensated Young's; alleged assurances made by St. Mary Parish as to how Young's would ultimately be compensated (which St. Mary Parish denies), and whether or not, and to what extent and by which method, surveys of the landfill area were made. At the conclusion of its motion, Young's contends it actually processed and installed 95,579 cubic yards of sand, 1,552,500 square feet of non-woven geotextile liner, and 118,184 cubic yards of clay, but was compensated for only 52,137 cubic yards of sand, 1,404,700 square feet of non-woven geotextile liner, and 52,694 cubic yards of clay. In its complaint, Young's contends it is entitled to the difference between what was actually paid and what it argues is owed under the contract, which amounts to approximately $870,748.32,[13] plus contractual interest at a rate of 12% per annum from the date the debt became due until paid.

Although the plaintiff properly lays out the standard this Court must employ is determining whether specific language in the contract is ambiguous, the plaintiff clearly, so to speak, puts the cart before the horse, asking this Court to consider parol evidence in order to determine whether the contract itself is ambiguous.

Under well-settled Louisiana law, a determination as to the existence of an ambiguity in a contract is a question of law for the court. *Grace v. Crespo*, 970 So.2d 1007, 1012 (La. App. 1st Cir.

---

[13] This Court has seen several references to the amount sought by Young's throughout the parties' materials, both related to the instant motion and not. Although the number is different in several places, the approximate amount sought by Young's appear to be in the neighborhood of $800,000.

2007), *citing Claitor v. Delahoussaye,* 858 So. 2d 469, 478 (La. App. 1st Cir. 2003), *writ denied,* 855

So.2d 764 (La. 2003). In *Texas Eastern Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737,

741-42 (5th Cir. 1998), the Fifth Circuit explained Louisiana law on the issue of contract ambiguity:

> Under Louisiana law, the interpretation of an unambiguous contract is an issue of law for the court. *See Rutgers, State Univ. v. Martin Woodlands Gas Co.,* 974 F.2d 659, 661 (5th Cir.1992). "When the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La.Civ.Code Ann. art. 2046 (West 1995). In addition, a contract provision is not ambiguous where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight. *See Lloyds of London v. Transcontinental Gas Pipe Line Corp.,* 101 F.3d 425, 429 (5th Cir.1996); *Rutgers,* 974 F.2d at 662. This court has stated that when the contract is not ambiguous, it has no authority to reach beyond the four corners of the document. *See Huggs, Inc. v. LPC Energy, Inc.,* 889 F.2d 649, 653 (5th Cir.1989).
>
> On the other hand, a contract is ambiguous, under Louisiana law, "when it is uncertain as to the parties' intentions and susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction." *See Lloyds of London,* 101 F.3d at 429. Under these rules of construction, "[e]ach provision of a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La.Civ.Code Ann. art. 2050 (West 1987). Contract provisions susceptible to different meanings should be interpreted "to avoid neutralizing or ignoring any of them or treating them as surplusage," *Lambert v. Maryland Cas. Co.,* 418 So.2d 553, 559-60 (La.1982), and "to preserve validity [of the contract]," *Gibbs Constr. Co. v. Thomas,* 500 So.2d 764, 769 (La.1987). Louisiana courts will not interpret a contract in a way that leads to unreasonable consequences or inequitable or absurd results even when the words used in the contract are fairly explicit. *See Makofsky v. Cunningham,* 576 F.2d 1223, 1229 (5th Cir.1978). "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." La.Civ.Code Ann. art. 2053 (West 1987).

Thus, a contract is not ambiguous merely because the parties disagree upon the correct

interpretation. *Central States, Southeast and Southwest Areas Pension Fund v. Creative*

*Development Co.*, 232 F.3d 406, 414 (5th Cir. 2000). In determining the presence of ambiguity *vel*

*non,* courts parse the provision in question and construe that provision in the context of the entire document. *Id.*[14]

Finally, a contract is not rendered ambiguous simply because the agreement does not expressly impose an obligation in question. *American Totalisator Co., Inc. v. Fair Grounds Corp.,* 3 F.3d 810, 814 (5th Cir. 1993), *citing Baber v. Hoffer,* 430 So.2d 220, 221 (La. App. 4th Cir.1983) ("When a clause of a contract is clear and unambiguous, the letter of it should not be disregarded under the pretext of pursuing the spirit."); *Ransom v. Camcraft, Inc.,* 580 So.2d 1073, 1077 (La. App. 4th Cir.1991) ("[T]he rule of strict construction does not authorize perversion of language or the creation of ambiguity where none exists...."). Thus, where a contract is silent to a particular obligation, and there is no evidence within the contact that an obligation was to be imposed on a party to the contract, the court may presume no such obligation was ever intended by the parties and no such obligation exists. *See American Totalisator,* 3 F.3d at 814 ("Nothing in the 1988 agreement can be construed reasonably as obligating AmTote to provide a system capable of handling intertrack wagering on four simultaneous events. Thus, no such obligation was ever intended by the parties and no such obligation exists.").

Based on the foregoing well-settled Louisiana law, in order for this Court to consider the intent of the parties by way of their actions before the contract was executed and after the contract was signed, this Court must first conclude the contract – which is the law between the parties – is ambiguous. Only then does the Court consider parol evidence.

---

[14] Additionally, the customs of an industry may be considered when construing ambiguous contracts. *Kenner Industries, Inc. v. Sewell Plastics, Inc.,* 451 So. 2d 557, 560 (La. 1984), *citing Henry v. The Ballard & Cordell Corp.,* 418 So.2d 1334, 1340 (La. 1982). The forgoing, however, presupposes that the contract has been determined to be ambiguous.

Here, the plaintiff argues first that the contract clearly states Young's will be paid "for the actual quantity of material processed and installed," but then alternately argues the contract is ambiguous as to the measurement and payment terms.  The particular provision that is singled out with respect to measurement and payment is Section 02350 of the Project Manual, which states:

SECTION 02350
Select Fill: LCS Sand Drainage Layer; And
Select Soil: Operational Cover and Structural Fill

1.3    MEASUREMENT

Leachate Collection System (LCS) Drainage Layer Sand and Select Soil Operational Cover: *Measured by the cubic yard of in-place material based on surveys conducted by Owner of pre-and post-installation conditions.*  Leachate Transfer Line Ramp and Leachate Collection Sump Stormwater Diversion Berm Structural Fill: Measured by the cubic yard of in-place material based on CAD volume calculations conducted by the Owner.

The plaintiff contends Section 02350 is ambiguous in the following ways: (1) it does not define "in-place," and does not state exactly when the measurements will be taken; (2) it does not designate the type of survey that will be performed; (3) it fails to state whether the material will be measured post-compaction; and (4) it fails to state what would occur if St. Mary Parish fails to perform or improperly performs the post-installation survey.  In support of its argument, Young's cites *Kenner Industries, Inc. v. Sewell Plastics, Inc.*, 451 So. 2d 557 (La. 1984), in which the Louisiana Supreme Court held a provision for "unit price" measurement in a subcontract was ambiguous.

Specifically, in *Kenner Industries*, a subcontractor (Kenner Industries) sued the contractor for breach of contract in connection with work the subcontractor did on a job site to build an addition to a warehouse.  451 So. 2d at 558.  The subcontract between Kenner Industries and the contractor

-15-

stated Kenner Industries would "furnish pump sand delivered to the job site and necessary labor and equipment to spread and compact in place to within 95% standard proctor method of testing. Unit Price $4.20 compacted in place." *Id.* The parties disputed the meaning of the provisions of the contract addressing measurement of materials, namely "Unit price $4.20 compacted in place," with Kenner Industries arguing the contract language was ambiguous. The trial court noted it was industry custom in the Reserve, Louisiana area to charge for materials by the truckload, but concluded the contract in question called for Kenner Industries to be paid "$4.20 per cubic yard for each compacted yard in place." *Id.* The trial court then relied on expert testimony presented at trial to determine the number of compacted yards of sand under the building and cast the contractor for 18,475.4 cubic yards of compacted sand, less whatever the contractor had already paid Kenner Industries.[15] The court of appeals affirmed, finding no error in the trial court's conclusion that the contract was not ambiguous. *Id.* However, on appeal, the Louisiana Supreme Court determined

> The meaning of the contract language in dispute, "unit price $4.20 compacted in place," is not clear or unambiguous. It does not indicate the unit of measurement to be used, although the parties do not dispute that cubic yards was intended. Nor does it indicate the time and place the cubic yard unit was to be measured-whether when and as delivered, as is the industry custom, or after it has been compacted in place, as the defendant contends.

*Id.* Consequently, and after evaluating additional evidence taken by the trial court, the Louisiana Supreme Court annulled and set aside the judgment appealed from and granted judgment in favor of Kenner Industries. *Id.* at 561.

This Court concludes *Kenner Industries* is distinguishable from the instant case. In *Kenner*

---

[15] The trial court also awarded an additional amount for sand used to construct a road across a field to the job site, because the defendant had barred Kenner Industries' use of the only ingress and egress to the job site. *Kenner Industries*, 451 So. 2d at 558.

*Industries*, the provisions of the contract addressing unit measurement and payment procedures were as follows:

> furnish pump sand delivered to the job site and necessary labor and equipment to spread and compact in place to within 95% standard proctor method of testing. ***Unit Price $4.20 compacted in place***.[16]

The Louisiana Supreme Court concluded the last portion of the provision – "Unit price $4.20 compacted in place" -- was ambiguous.  However, this Court notes the measurement provision in the instant case is more precise than the provision in *Kenner Industries*, to wit:

> 1.3    MEASUREMENT
>
> Leachate Collection System (LCS) Drainage Layer Sand and Select Soil Operational Cover: *Measured by the cubic yard of in-place material based on surveys conducted by Owner of pre-and post-installation conditions*.  Leachate Transfer Line Ramp and Leachate Collection Sump Stormwater Diversion Berm Structural Fill: Measured by the cubic yard of in-place material based on CAD volume calculations conducted by the Owner.

In the instant case, the provision addressing unit measurement in Section 02350 is more defined than the provision in *Kenner Industries*, providing for measurement "by the cubic yard of in-place material based on surveys conducted by Owner of pre-and post-installation conditions." Unlike the provision in the subcontract in *Kenner Industries*, the contract in the instant case indicates the unit of measurement to be used (cubic yards), indicates the time and place the cubic yard unit was to be measured, pre- and post-installation, and the method to be used, "based on surveys conducted by Owner." Therefore, all aspects, including the temporal aspect of when the measurements will be made are included in the instant contract.  That the contract does not indicate whether the material is to be measured in a compacted or non-compacted form does not itself render the contract

---

[16] *Kenner Industries*, 451 So.2d at 558 (emphasis added).

ambiguous. Indeed, compaction would appear to be a negotiated element of the contract, as the requirement for compaction would inevitably lead to the need for more materials, and, hence, higher costs to St. Mary Parish. Even if this were not a negotiated element of the contract, this Court does not conclude the contract's silence on the issue of compaction creates an ambiguity in the contract.

In its motion, Young's argues the surveys referenced in both Sections 02350 and 02373 were not conducted. St. Mary Parish disputes the foregoing *factual* allegation, but, for purposes of this motion, this Court need not determine whether surveys were or were not conducted. The references in both sections to "surveys" to be "conducted by owner," and when those surveys were to be conducted is set within the contract; to the extent the surveys were not further identified, beyond placing them at the owner's onus, does not render the contract ambiguous, rather reflects a choice made by the parties. If the surveys were not performed, the foregoing fact might be grounds to find the contract was *breached*, a factual determination not at present before the Court. However, the fact that the referenced surveys might not have been conducted – a fact St. Mary Parish denies – does not render the measurement provisions ambiguous.

With the foregoing in mind, and after a careful review of Section 02350, the Change Order of October 26, 2005, and the applicable law, this Court concludes the unit measurement and payment provisions in Section 02350 are not ambiguous as a matter of law. Although Section 02350 contains a term of art – "in place" materials – that term has a specific meaning in the construction industry and was understood by all. As previously indicated,Anthony Hoppe, Jr., the engineer for the project in question, in his Affidavit:

> The term "in place material" denotes the volume of fill in the cell after installation. As such, this quantity is independent of the imported volume required to fill the cell

and is based solely on the area of the cell and the depth of the fill after installation.[17]

Additionally, Indeed, Dennis Young, the principal of Young's, testified as follows:

Q:      So my question began with the discussion regarding in-place measurement.
        Tell me about the first two payments.

A:      We discussed there was like 52,000 yards and all of a sudden, we're getting
        more yardage at this time.  That's when him and I started discussing it.

Q:      When you read the bid documents in preparation for submitting the bid, did
        you see where in the measurement portion of the bid documents it described
        the measurement for the fill to be in place?

A:      Yes, And I also read where the 52,000 was an estimate only and to be
        measured by the engineer before and after also.

Q:      So the answer is yes, you saw that the measurements standard was in-place
        measurement?

A:      Yes.

Q:      On either side of the two solid waste facilities that Young's had constructed
        prior to this project, did they use an in-place measurement?

A:      I don't remember.

**Q:      When you read in-place measurement in the bid documents prior to
        submitting the bid, what did you understand that to mean?**

**A:      Length times width times depth.[18]**

Thus, to the extent a term of art – here, "in-place materials" – is referenced in the contract,

the Court concludes that term of art was understood by all.  Additionally, this Court concludes the

Change Order of October 26, 2005 does not change the manner in which the materials would be

measured.  Section 02350(a)(a) in the Change Order references "Spreading and Processing Leachate

---

[17] *See* Hoppe Affidavit, attached as Exhibit 1 to defendant's opposition brief, SMP-17, at ¶6.

[18] *See* Deposition of Dennis Young, SMP-212-13 (emphasis added).

Collection System Sand," thus the Change Order of October 26, 2005 merely addresses the manner

in which the work to be performed by Young's is described.  Indeed, no party disputes the work to

be done by Young's was the "spreading and processing" of the fill material.  What *is* in dispute is

the manner in which the fill material would be measured and how Young's would be paid based on

that measurement.  The Change Order of October 26, 2005 merely changes the unit price of the fill

material; it does not change the manner in which the fill material would be measured.  As previously

noted however, the Change Order of October 26, 2005 also noted St. Mary Parish – as opposed to

Young's - would henceforth provide the fill material.

Additionally – to the extent such is argued – this Court concludes Section 02373, addressing

geotextile liners – is not ambiguous.  First, Young's has not identified any term contained within

Section 02373 that is ambiguous, but appears to argue only that the referenced surveys under that

section were not performed which, this Court again notes, is a separate legal inquiry from that before

the Court within this motion.  As this Court has already stated, such is a matter of whether the

contract has been *breached* or not, which is a matter not before the Court at this time.

Finally, this Court notes Section 8 of the contract, entitled "Contractor's Representations,"

states:

Section 8.01   In Order to induce OWNER to enter into this Agreement, CONTRACTOR make the following representations:

A.     CONTRACTOR has examined and carefully studies sic] the Contract Documents and the other related data identified in the Bidding Documents.

[ . . . ]

**J.      The Contract Documents are generally sufficient to indicate and convey understanding of all terms and conditions for**

-20-

performance and furnishing of the Work.[19]

As this contract was signed by Young's, the Court will presume, but presume only, Young's read and understood the foregoing term of the contract.

Considering the foregoing, this Court concludes the unit measurement and payment provisions of Section 02350, as modified by the Change Order, are not ambiguous, as the provision provided for measurement "by the cubic yard of in-place material based on surveys conducted by Owner of pre-and post-installation conditions;" indicates the unit of measurement to be used (cubic yards); and indicates the time and place the cubic yard unit was to be measured, *i.e.*, "*based on surveys conducted by Owner of pre-and post-installation conditions*." Although, perhaps, indefinite, as the contemplated pre- and post-surveys to be conducted by the owner were to provide the final definition, the language is not ambiguous; a legal distinction which is not without import and consequence. This Court for the same reasons, concludes Section 02373 is not ambiguous.

Additionally, this Court does not conclude, as, perhaps, could be inferred to have been argued by plaintiff, based on the evidence presented at this time, there was no meeting of the minds of the parties in confecting the contract, which might serve to vitiate the entire contract. Indeed, the evidence shows the parties understood the work that was to be performed by Young's, and Young's did, in fact, perform such work and the parties agreed upon a manner and method to determine payment, albeit a method and manner which incorporated surveys to be conducted at two different, distinct and yet defined points in time in the future. What is in dispute is the actual method and manner of measurement and payment used and thus, the amount of remuneration owed to Young's pursuant to the contract.

---

[19] *See* SMP-24-25 (emphasis added).

Notwithstanding, it is of interest that it appears neither party's position as to how Young's was to have been compensated was within or contemplated by Section 02350. Indeed, the provision for measurement of materials indicates payment shall be made to Young's based on in-place materials. Young's argues – and St. Mary Parish does not appear to dispute – St. Mary Parish paid the initial invoices for work performed by Young's based on the truckload of materials that were delivered to the worksite. It is unclear to the Court whether subsequent amounts were paid by St. Mary Parish based on estimates of materials or the survey conducted by probe by St. Mary Parish. Young's contends it was ultimately paid based on the estimates contained in the Project Manual; not the required pre- and post-surveys. However, the contact clearly states in Section 11.03:

> B. The *estimated quantities* of items of Unit Price Work are not guaranteed and are *solely for the purpose of comparison of Bids and determining an initial Contract Price*. Determinations of the actual quantities and classifications of Unit Price Work performed by Contractor will be made by Engineer subject to the provisions of Paragraph 9.07.[20]

(emphasis added)

Therefore, this Court notes, as of interest, payments are argued to have been made to and accepted by Young's by at least two different methods, *neither of which appears to be in compliance with the contract* as an applicable method of measurement and/or payment. This Court does not address what, if any legal significance such a finding might have, however, cannot ignore the presence of the arguments made by both parties. However, this Court shall not, nor should it, rule on those arguments at this juncture, as they are outside the confines of the legal issue presented by the present motions.

Considering the foregoing, the Motion for Summary Judgment [Doc. 71] filed by Young's

---

[20] *See* SMP-65.

General Contracting, Inc. is DENIED, this Court having concluded that the unit measurement and payment provisions of Sections 02350 and Section 02373, either as set forth originally or as modified by the Change Order of October 26, 2005, are not ambiguous.

IT IS FURTHER ORDERED that no later than ten (10) working days from the issuance of this Ruling, the parties shall file pocket briefs, not to exceed 7 pages each, addressing *by jurisprudence or codal article,* and clarifying their legal arguments as to the issues before the Court. In particular, they are to address the factual issues which seem inherent within their arguments, i.e., neither the actual methods of payment employed by one party, nor the payment method argued by opposing party, are ones contemplated by the contract, as well as what legal theory each is employing should that factual scenario exist.

THUS DONE AND SIGNED in Lafayette, Louisiana, this ___27___ day of August 2010.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

-23-